E-FILED
Monday, 28 June, 2021  04:18:54 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| SPIRE STL PIPELINE LLC, ) | |
| a Missouri limited liability company, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 3:18-cv-03204 |
| ) | |
| BETTY ANN JEFFERSON as TRUSTEE ) | |
| of the BETTY ANN JEFFERSON ) | |
| TRUST #11-08, *et al.*, ) | |
| ) | |
| Defendants. ) | |

---

**FIRST SUPPLEMENT TO THE MOTION FOR PRELIMINARY INJUNCTION FOR
IMMEDIATE POSSESSION OF CERTAIN TEMPORARY EASEMENTS AND
TEMPORARY ACCESS ROAD TAR-010**

NOW   COMES, Plaintiff, SPIRE STL PIPELINE LLC, ("Spire STL") by and through

its attorneys, Sorling Northrup, Lisa A. Petrilli and David A. Rolf, of Counsel, and for its First

Supplement to its Motion for Preliminary Injunction for Immediate Possession of Certain

Temporary Easements and Temporary Access Road TAR-010 and Memorandum in Support

against the Defendants, Philip Brown and Zena Brown (Counts XVI, XVII, XVIII, XIX), and

against Defendant Marc Steckel (Counts XXII, XXIII, XXV) pursuant to Federal Rule of Civil

Procedure 15(d) and Local Rule 7.1(F), respectfully represents as follows:

1.      On December 14, 2018, this Court entered an order granting a preliminary

injunction to Spire STL Pipeline. (d/e 114)

2.      In early 2019, Spire STL Pipeline commenced construction of the Spire STL

Pipeline Project.

3.      Spire STL Pipeline completed construction and restoration activities prior to August 2020.

4.      On January 12, 2021, Spire STL Pipeline moved to modify the order granting the preliminary injunction as at that time Spire STL Pipeline believed it no longer needed access to the temporary easement areas and temporary access roads to comply with the conditions in the certificate issued by the Federal Energy Regulatory Commission (FERC) dated August 3, 2018 in Docket No. CP17-40-000 / CP17-40-001 (FERC Certificate).

5.      On March 18, 2021, FERC issued a new order in Docket No. CP17-40-000 / CP17-40-001, requiring that Spire undertake additional remediation activities on certain landowners' properties based upon a report from the Illinois Department of Agriculture (IDOA).

6.      On June 15, 2021, Spire STL Pipeline filed its Motion for Preliminary Injunction for Immediate Possession of Certain Temporary Easements and Temporary Access Road TAR-010. (d/e 173)

7.       On June 22, 2021 the United States Court of Appeals for the District of Columbia Circuit (DC Circuit) entered its order vacating Spire STL Pipeline's FERC Certificate and remanding to FERC for further proceedings.  A copy of the slip opinion is attached as **Exhibit 1**.

8.      Pursuant to DC Circuit Rule 35(a), Spire STL Pipeline has 45 days from June 22, 2021 within which to file a Petition for Panel Rehearing or Rehearing En Banc.  The mandate is not final until at least seven (7) days after the time to file a petition expires.  *See* Fed. R. App. P. 41 and DC Circuit Rule 41.

9.      If a petition is denied, the Clerk of the Court will then issue an order remanding the matter to FERC for further action to vacate the FERC Certificate.

10.     Until the DC Circuit issues the mandate, Spire STL Pipeline's FERC Certificate remains valid and in effect and this Court continues to have jurisdiction to proceed with a determination on Spire STL Pipeline's Motion.

11.     Since the reason for Spire STL Pipeline's motion is to permit Spire STL Pipeline access to remediate the Brown and Steckel properties, something that will likely need to occur regardless of the ultimate validity of the FERC Certificate, it is in the interest of judicial economy and convenience of the parties to proceed with this motion.

WHEREFORE, Plaintiff, Spire STL Pipeline, respectfully requests that this Court enter an Order granting immediate possession of the of the easements referred to as "Temporary Workspace", "Additional Temporary Workspace", and "Temporary Access Road" TAR-010 defined in Verified Complaint Exhibits 17A, 17B, 18A, 18B, 19A, 19B, 20A, 20B, 23A, 23B, 24A, 24B, 26A, and 26B, to Spire STL Pipeline for the remediation work ordered by the FERC in its March 18, 2021 Order in Docket No. CP17-40-000 / CP17-40-001, and for any other relief that this Court deems just.

Dated: June 24, 2021                    Respectfully submitted,

                                        SPIRE STL PIPELINE LLC,
                                        Plaintiff,

                                        By:  /s/ Lisa A. Petrilli
                                                One of Its Attorneys

Sorling Northrup
Lisa A. Petrilli, of Counsel (ARDC #6280865)
One North Old State Capitol, Suite 200
Post Office Box 5131
Springfield, IL 62705-5131
Telephone:  (217)544-1144
Facsimile:  (217)522-3173
E-Mail:  lapetrilli@sorlinglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Sorling Northrup
David A. Rolf, of Counsel (ARDC #6196030)
One North Old State Capitol, Suite 200
Post Office Box 5131
Springfield, IL 62705-5131
Telephone:  (217)544-1144
Facsimile:  (217)522-3173
E-Mail:  darolf@sorlinglaw.com
*ATTORNEY TO BE NOTICED*

## CERTIFICATE OF SERVICE

I hereby certify that June 24, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following and by email to the following at the email addresses shown below:

Carolyn Elefant
1440 G Street, NW
Washington, DC 20005
Telephone: (202) 297-6100
Email: carolyn@carolynelefant.com

Joshua D. Evans
103 East Pearl Street
Jerseyville, IL 62016
Telephone: (618) 268-5081
office@jevanslegal.com

S.T. Turman Contracting, L.L.C.
c/o Scott Turman, Manager
300 Commerce Blvd.
Jerseyville, IL 62052
Email:  stturman@gmail.com
          amyturman2@gmail.com

Scott Turman
21599 Rangeline Rd.
Jerseyville, IL 62052
Email:  stturman@gmail.com
          amyturman2@gmail.com

/s/ Lisa A. Petrilli

Sorling Northrup
Lisa A. Petrilli, of Counsel (ARDC #6280865)
One North Old State Capitol, Suite 200
Post Office Box 5131
Springfield, IL 62705-5131
Telephone:  (217)544-1144
Facsimile:   (217)522-3173
E-Mail:  lapetrilli@sorlinglaw.com

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued March 8, 2021        Decided June 22, 2021

No. 20-1016

ENVIRONMENTAL DEFENSE FUND,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SPIRE MISSOURI INC. AND SPIRE STL PIPELINE LLC,
INTERVENORS

————

Consolidated with 20-1017

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Natalie M. Karas* argued the cause for petitioner Environmental Defense Fund. With her on the briefs were *Erin Murphy*, *Jason T. Gray*, *Kathleen L. Mazure*, *Matthew L. Bly*, and *Sean H. Donahue.*

*Henry B. Robertson* argued the cause and filed the briefs for petitioner Juli Steck.

2

*Jennifer Danis* and *Edward Lloyd* were on the brief for *amicus curiae* Dr. Susan Tierney in support of petitioners.

*Randy M. Stutz* was on the brief for *amicus curiae* the American Antitrust Institute in support of petitioners.

*Anand R. Viswanathan*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Jonathan S. Franklin* argued the cause for intervenors Spire STL Pipeline LLC and Spire Missouri Inc. in support of respondent.  With him on the brief were *Christopher J. Barr*, *Jessica R. Rogers*, *Matthew J. Aplington*, *Thomas E. Hirsch III*, *David T. Kearns*, *Daniel Archuleta*, and *Sean P. Jamieson.*

*Paul Korman*, *Michael R. Pincus*, and *Michael Diamond* were on the brief for *amicus curiae* Interstate Natural Gas Association of America in support of respondent.

Before: TATEL and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In the action leading to this petition for review, the Federal Energy Regulatory Commission (the "Commission" or "FERC") issued a certificate of public convenience and necessity ("Certificate") under section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A), to Intervenor-Respondent Spire STL Pipeline LLC ("Spire STL") to construct a new natural gas pipeline in the St. Louis area. The Commission may issue such a

3

Certificate only if it finds that construction of the new pipeline "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e).

Pursuant to the Commission's "Certificate Policy Statement," *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000), FERC first considers whether there is a market need for the proposed project. If there is a need for the pipeline, FERC then determines whether there will be adverse impacts on "existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline." *Id*. at 61,745. If adverse impacts on these stakeholders will result, the Commission "balanc[es] the evidence of public benefits to be achieved against the residual adverse effects." *Id.* In analyzing the need for a particular project, the Certificate Policy Statement makes it clear that the Commission will "consider *all* relevant factors*.*" *See id.* at 61,747 (emphasis added).

The issue in this case arose in 2016, when Spire STL announced its intent to build a pipeline in the St. Louis metropolitan area. In August of that year, Spire STL held an "open season" during which it invited natural gas "shippers" to enter into preconstruction contracts, also known as "precedent agreements," for the natural gas the pipeline would transport. But no shippers committed to the project during the open season. Instead, after the open season finished without any takers, Spire STL privately entered into a precedent agreement with one of its affiliates, Laclede Gas Company – now known as Intervenor-Respondent Spire Missouri Inc. ("Spire

4

Missouri") – for just 87.5 percent of the pipeline's projected capacity.

In January 2017, Spire STL applied to the Commission for a Certificate. It conceded that the proposed pipeline was not being built to serve new load, as natural gas demand in the St. Louis area is projected to stay relatively flat for the foreseeable future. Rather, Spire STL claimed that the pipeline would result in other benefits, such as enhancing reliability and supply security, providing access to new sources of natural gas supply, and eliminating reliance on propane "peak-shaving" during periods of high demand. As evidence of need, Spire STL principally relied on its precedent agreement with Spire Missouri. In September 2017, the Commission – pursuant to its obligations under the National Environmental Policy Act ("NEPA") – released an Environmental Assessment ("EA") for construction and operation of the proposed pipeline, finding that they would have no significant environmental impact.

Petitioner Environmental Defense Fund ("EDF"), along with several other parties, challenged Spire STL's Certificate application. EDF contended, *inter alia*, that the precedent agreement between Spire STL and Spire Missouri should have only limited probative value in FERC's assessment of Spire STL's application because the two companies were corporate affiliates. In addition, Petitioner Juli Steck, then known as Juli Viel, contested the efficacy of the EA.

On August 3, 2018, in an Order Issuing Certificates ("Certificate Order"), FERC granted the authorizations for the new pipeline. *See* Joint Appendix ("J.A.") 932. FERC's decision acknowledged that the pipeline was not meant to serve new load demand. Nevertheless, FERC rejected arguments that a market study should be undertaken to establish the need for the project. Rather, the Commission's decision principally

5

focused on the precedent agreement between Spire STL and Spire Missouri in finding that there was market need for the project. And the Commission stated that it would not "second guess" Spire Missouri's purported "business decision" in entering into the precedent agreement with Spire STL, even though the shipper and the pipeline were affiliates. J.A. 968. In November 2019, by a 2-1 vote, FERC denied requests for rehearing filed by EDF and Steck. These two parties now seek review in this court.

EDF asserts that the Commission's decision to award a Certificate to Spire STL was arbitrary and capricious because the Commission uncritically and exclusively relied on the affiliated precedent agreement to find need and because the Commission failed to sufficiently justify its conclusion that the new pipeline's benefits would outweigh its adverse effects. Steck, in turn, renews many of her challenges to the Commission's environmental analysis, including its EA.

For the reasons explained below, we find that Petitioner Steck lacks standing to pursue her claims. However, we find no jurisdictional infirmities in EDF's petition for review. On the merits, we agree with EDF that the Commission's refusal to seriously engage with nonfrivolous arguments challenging the probative weight of the affiliated precedent agreement under the circumstances of this case did not evince reasoned and principled decisionmaking. In addition, we find that the Commission ignored record evidence of self-dealing and failed to seriously and thoroughly conduct the interest-balancing required by its own Certificate Policy Statement. Therefore, FERC's Certificate Order and Order on Rehearing do not survive scrutiny under the applicable arbitrary and capricious standard of review. *See Minisink Residents for Env't Pres. & Safety v. FERC* ("*Minisink*"), 762 F.3d 97, 105-06 (D.C. Cir. 2014). Because "vacatur is the normal remedy" in

6

circumstances such as we find in this case, we vacate FERC's Orders and remand the case to the Commission for appropriate action. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

## I. BACKGROUND

### A. Statutory and Regulatory Background

The Natural Gas Act provides the Commission with authority "to regulate the transportation and sale of natural gas in interstate commerce." *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019). To safeguard the public, "Section 7 of the Act requires an entity seeking to construct or extend an interstate pipeline for the transportation of natural gas to obtain [a Certificate] from the Commission." *Id.* (citing 15 U.S.C. § 717f(c)(1)(A)). The Commission may issue Certificates only if, among other things, it finds that the proposed construction or extension "is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied." 15 U.S.C. § 717f(e). In deciding whether to issue Certificates under this standard, the Commission must "evaluate *all* factors bearing on the public interest." *Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (emphasis added). And there is good reason for the thoroughness and caution mandated by this approach: A Certificate-holder may exercise eminent domain against any holdouts in acquiring property rights necessary to complete the pipeline. 15 U.S.C. § 717f(h).

In its Certificate Policy Statement, the Commission has set forth the "analytical steps" that guide its dispositions of Certificate applications. *See* 88 FERC at 61,745. The first question the Commission considers is "whether the project can proceed without subsidies from [the applicant's] existing customers." *Id.* "To ensure that a project will not be subsidized

7

by existing customers, the applicant must show that there is market need for the project." *Myersville Citizens for a Rural Cmty., Inc. v. FERC* ("*Myersville*"), 783 F.3d 1301, 1309 (D.C. Cir. 2015).

If there is market need, the Commission then determines whether there are likely to be adverse impacts on "existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline." 88 FERC at 61,745. If adverse impacts on these stakeholders will result, "the Commission balances the adverse effects with the public benefits of the project, as measured by an 'economic test.'" *Myersville*, 783 F.3d at 1309 (quoting 88 FERC at 61,745)*.* "Adverse effects may include increased rates for preexisting customers, degradation in service, unfair competition, or negative impact on the environment or landowners' property." *Id.* (citing 88 FERC at 61,747-48). Public benefits generally include "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Id.* (quoting 88 FERC at 61,748).

As to market need and interest-balancing, the Certificate Policy Statement further provides:

> Rather than relying only on one test for need, the Commission will consider *all relevant factors* reflecting on the need for the project. These might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving

8

the market. The objective would be for the applicant to make a sufficient showing of the public benefits of its proposed project to outweigh any residual adverse effects . . . .

The amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests. Thus, *projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline. However, the evidence necessary to establish the need for the project will usually include a market study. . . . Vague assertions of public benefits will not be sufficient.*

88 FERC at 61,747-48 (emphases added).

The Certificate Policy Statement also specifically addresses the significance of precedent agreements in demonstrating need:

Although the Commission traditionally has required an applicant to present [preconstruction] contracts to demonstrate need, that policy . . . no longer reflects the reality of the natural gas industry's structure, nor does it appear to minimize the adverse impacts on any of the relevant interests. Therefore, although contracts or precedent agreements always will be important evidence of demand for a project, *the Commission will no longer require an applicant to present contracts for any specific percentage of the new capacity.* Of course, if an applicant has entered into contracts or precedent agreements for the capacity, . . . they would constitute significant evidence of demand for the project.

9

> *Eliminating a specific contract requirement reduces the significance of whether the contracts are with affiliated or unaffiliated shippers*, which was the subject of a number of comments. *A project that has precedent agreements with multiple new customers may present a greater indication of need than a project with only a precedent agreement with an affiliate*. The new focus, however, will be on the impact of the project on the relevant interests balanced against the benefits to be gained from the project. As long as the project is built without subsidies from the existing ratepayers, the fact that it would be used by affiliated shippers is unlikely to create a rate impact on existing ratepayers.

*Id.* at 61,748-49 (emphases added).

## B.  The Instant Case

For the last two decades, natural gas consumption in the St. Louis area has been roughly flat. And when the Commission issued the Certificate Order in this case, all parties agreed that future demand projections were not expected to increase. *See* Certificate Order, J.A. 979 (noting that "[a]ll parties" agreed that natural gas demand forecasts "for the region are flat for the foreseeable future"); *see also, e.g.*, J.A. 583 (July 2017 report prepared by Concentric Energy Advisors on behalf of Spire Missouri and submitted to the Commission stating that Spire Missouri "does not expect any significant growth or decline in . . . forecasted demand over time"); Spire STL Pipeline LLC Docket Nos. CP17-40-000 and 001 Response to Data Request at 9, Accession No. 20180313-5193 (Mar. 13, 2018) (Spire STL submission to the Commission stating that its "gas supply annual demand requirement" was projected to "remain

10

relatively constant" at "average historical usage" levels for the next 20 years).

As of 2016, five natural gas pipelines served the St. Louis region. At that time, a majority of Spire Missouri's natural gas supply was provided via pipelines owned and operated by Enable Mississippi River Transmission, LLC ("Enable MRT"). It is undisputed that, prior to Spire STL's application in this case, Spire Missouri had declined to subscribe to proposals for new natural gas pipelines in the region, stating that the proposed new pipelines did not make operational and economic sense for its customers.

In 2016, Spire STL announced its intent to construct a new natural gas pipeline to serve homes and businesses in the St. Louis area. Following an amendment to its Certificate application, the final length of the proposed pipeline was approximately 65 miles. The initial estimated cost of the project was approximately $220 million, with a proposed overall rate of return of 10.5 percent – a return on equity of 14 percent and a cost of debt of seven percent.

Between August 1, 2016 and August 19, 2016, Spire STL held an "open season," during which it sought to enter into precedent agreements with natural gas shippers. After an unsuccessful open season, Spire STL then entered into a single precedent agreement with its affiliate, Spire Missouri, for 87.5 percent of the pipeline's 400,000 dekatherm-per-day transport capacity. Spire STL indicated that other shippers expressed interest, but it did not enter precedent agreements with any of them.

On January 26, 2017, Spire STL applied to the Commission for a Certificate to begin construction of the proposed pipeline. The stated purpose of the pipeline was to "enhance reliability and supply security; reduce reliance upon

11

older natural gas pipelines; reduce reliance upon mature natural gas basins . . . ; and eliminate reliance on propane peak-shaving infrastructure." J.A. 89. In particular, the new pipeline would provide gas from newly accessed sources in the Rocky Mountains and Appalachian Basin; avoid transecting the New Madrid Seismic Zone, unlike other pipelines in the area; and reduce use of propane for "peaking" during periods of high demand, which purportedly has negative environmental, operational, and cost-related impacts.

Spire STL made it clear that its new pipeline "was not [being] developed to serve new demand." J.A. 265. It further stated that "conjecture" as to whether Spire Missouri might "reduce its contract entitlements on other pipelines" as a result of contracting for capacity on the proposed pipeline "would be inappropriate." J.A. 104. The application also asserted that the proposed project was "the result of a fair process undertaken by [Spire Missouri] to examine competitive alternatives and select the one that would best meet its needs." J.A. 105. In materials it later submitted to the Commission, Spire Missouri acknowledged that it used propane peaking on only three days between 2013 and 2018 – a consecutive three-day period in January 2014.

Several parties either protested or conditionally protested Spire STL's application, including the Missouri Public Service Commission (the "Missouri Commission") – a state body that regulates natural gas shippers – and Enable MRT. In its conditional protest, the Missouri Commission expressed skepticism as to the "need for the project," J.A. 143, while also urging FERC to undertake a particularly thorough review of the impact the project might have on customers of existing pipelines given that "the St. Louis market is static and there is no demonstrated need . . . for . . . new capacity," *see* J.A. 152. In its protest, Enable MRT claimed that the project "ha[d] been

12

shielded from a truly competitive market," J.A. 155, and that "where a proposed project does not have precedent agreements for all of the capacity of the project and the project's only precedent agreement is with a single affiliated shipper with predominantly captive retail customers, the mere existence of such a precedent agreement is insufficient to show adequate market demand," J.A. 161. *See also* J.A. 181 ("As a[] [shipper] with captive retail customers, [Spire Missouri] can pass through to those customers the costs associated with its contract with Spire [STL]. Rather than pay lower rates to receive gas from an unaffiliated pipeline, Spire [STL] and [Spire Missouri] can maximize the revenue and return earned by their corporate parent by having [Spire Missouri] pay to receive service from Spire's Project."). Enable MRT also highlighted certain public-facing comments by Spire Missouri and Spire STL's corporate parent indicating that construction of the pipeline would increase shareholder earnings. And in later submissions to the Commission, Enable MRT asserted "that the affiliate relationship between [Spire Missouri] and Spire STL [had] thwarted fair competition," J.A. 812, and that economic risks of the pipeline would be shifted onto Spire Missouri's "captive ratepayers [for natural gas] and the ratepayers of pipelines that would experience decontracting due to" the new pipeline, J.A. 813.

In May 2017, EDF sought to intervene and filed a protest. It raised several arguments regarding the probative weight of the precedent agreement between Spire STL and Spire Missouri in demonstrating market need for the proposed pipeline, given their affiliated relationship. In particular, EDF expressed concerns regarding the growing trend for

> utility holding companies [to] enter[] into affiliate transactions whereby the retail utility affiliate commits to new long term capacity with its pipeline

13

> developer affiliate. The essence of this financing structure is to take a cost pass-through for a retail gas or electric distribution utility – a contract for natural gas transportation services – and pay those transportation fees to an affiliated pipeline developer entitled to accrue return on its investment from that same revenue. Thus ratepayer costs which may not be justified by ratepayer demand are being converted into shareholder return.

J.A. 550 (footnote omitted). EDF also requested that the Commission "apply heightened scrutiny" to the Certificate application given the affiliated relationship between Spire STL and Spire Missouri. *See* J.A. 556-58; *see also* J.A. 856 (asserting that "there is a gap . . . between state and federal regulatory oversight of affiliate precedent agreements, such as the one Spire STL has submitted in this proceeding to demonstrate market need"). And it asserted that "[w]here, as here, there is evidence of self-dealing calling into question the need for a project, th[e] Commission should take steps to ensure that customers are protected." J.A. 558; *see also* J.A. 559 (explaining why "record evidence" should have resulted in "enhanced regulatory scrutiny" in this case); J.A. 855 (reiterating "that the pursuit of earnings growth must be balanced against the inherent risk to customers embedded in [this] affiliate transaction").

In September 2017, Commission staff published an Environmental Assessment for the proposed pipeline, including their finding of no significant impact from constructing and operating the pipeline. In reaching that conclusion, the EA noted that the pipeline "was not developed to serve new demand." J.A. 765, 768.

14

On October 30, 2017, Petitioner Steck moved to intervene. In comments to the Commission, she alleged that there were several deficiencies in the EA, "particularly in its treatment of the purpose and need for the project and of climate change." J.A. 791. She therefore requested preparation of either a full Environmental Impact Statement or a revised EA.

On August 3, 2018, by a 3-2 vote, the Commission issued the Certificate Order, granting a Certificate to Spire STL. Therein, the Commission referenced the concerns of the protestors and intervenors regarding the affiliated precedent agreement, *see, e.g.*, J.A. 938-40, 944-47, 950-51, and noted that "[a]ll parties, including Spire, agree that the new capacity is not meant to serve new demand, as load forecasts for the region are flat for the foreseeable future," J.A. 979. The Commission also found that data provided by Spire STL and Enable MRT "show[ed] that the difference in the cost of gas delivered to Spire Missouri via the proposed [pipeline] as compared with gas accessed via" current pipelines "was not materially significant." J.A. 980.

The Commission purported to apply the Certificate Policy Statement in reaching its decision. *See* J.A. 940-41; *see also* J.A. 941 n.31 ("[T]he current Certificate Policy Statement remains in effect and will be applied to natural gas certificate proceedings pending before the Commission as appropriate." (citation omitted)). However, the Commission's decision appeared to rely entirely on the precedent agreement between Spire STL and Spire Missouri in finding that there was market need for the project. *See* J.A. 963 ("The fact that Spire Missouri is affiliated with the project's sponsor does not require the Commission to look behind the precedent agreements to evaluate project need. . . . [T]he Commission may reasonably accept the market need reflected by the applicant's existing contracts with shippers and not look behind those contracts to

15

establish need." (footnotes omitted)); J.A. 967 ("We disagree with [Enable] MRT's stance that the mere existence of a precedent agreement is insufficient to show adequate market demand when a project is subscribed by affiliates for less than the full project capacity." (footnote and internal quotation marks omitted)). FERC also explicitly rejected calls for a market study to assess the need for a new pipeline. *See* J.A. 966-67. And it dismissed arguments that Spire STL had engaged in anticompetitive behavior, while finding that whether Spire Missouri or its corporate parent had engaged in anticompetitive behavior was irrelevant to its determination. Rather, according to the Commission, any concerns regarding anticompetitive behavior could only be addressed by the Missouri Commission, as "Spire Missouri is not regulated by this Commission and thus we have no authority to dictate its practices for procuring services." J.A. 964.

The Commission explained that it was generally unwilling to consider arguments raising "issues fall[ing] within the scope of the business decision of a shipper," even if the shipper and the pipeline were affiliates. J.A. 968; *see also* J.A. 943 ("The Commission is not in the position to evaluate Spire Missouri's business decision to enter a contract with Spire [STL] for natural gas transportation, which . . . will be evaluated by the [Missouri Commission]."). In particular, FERC was unwilling to assess the challenges that protestors had raised questioning the purported justifications that Spire STL had offered in support of the proposed new pipeline. As the Commission phrased it:

> The lengthy arguments the protestors make regarding whether Spire Missouri should have chosen to utilize existing infrastructure to meet the project purposes or committed to capacity on previously proposed projects, whether retiring Spire Missouri's propane

16

> peaking facilities and replacing them with capacity
> from the [proposed pipeline] is a cost effective
> approach, whether choosing a transportation path that
> avoids the New Madrid fault is unnecessarily
> cautious, and even, in the first instance, the extent to
> which the [proposed pipeline] will provide economic
> and rate benefits to Spire Missouri's customers, all go
> to the reasonableness and prudence of Spire
> Missouri's decision to switch transportation
> providers.

J.A. 968. As to why Spire Missouri had declined to subscribe
to, or otherwise endorse, "prior failed [pipeline] projects" in the
area, the Commission found that such questions were "not
necessarily relevant to [its] decision" and explicitly declined to
resolve any related factual questions. *See* J.A. 968-69.

Regarding its balancing of the benefits and adverse
impacts of the project, the Commission, without deeper
analysis, simply concluded

> that the benefits that the [proposed pipeline] will
> provide to the market, including enhanced access to
> diverse supply sources and the fostering of
> competitive alternatives, outweigh the potential
> adverse effects on existing shippers, other pipelines
> and their captive customers, and landowners or
> surrounding communities. Consistent with the criteria
> discussed in the Certificate Policy Statement and
> [Natural Gas Act] section 7(e), . . . we find that the
> public convenience and necessity requires approval of
> Spire [STL]'s proposal.

J.A. 986.

17

Finally, the Commission rejected the vast majority of challenges to its Environmental Assessment, including those of Petitioner Steck.

Commissioners LaFleur and Glick dissented. Both believed that the Commission should have looked behind and beyond the precedent agreement in evaluating market need, given the facts of the case and the affiliated nature of the two Spire entities. Commissioner Glick noted that "[t]here are several potential business reasons why [Spire STL]'s corporate parent might prefer to own a pipeline rather than simply take service on it, such as the prospect of earning a 14 percent return on equity rather than paying rates to [Enable] MRT or another pipeline company." J.A. 1058. In addition, both dissenting Commissioners would have found that adverse impacts of the proposed pipeline outweighed benefits.

Several parties filed rehearing requests, including Steck on August 31, 2018 and EDF on September 4, 2018. In her request, Steck renewed several of her challenges to the EA and also objected to the Commission's environmental analysis in the Certificate Order. EDF argued that the precedent agreement was not dispositive evidence of market need. It also challenged Spire STL's contentions as to the benefits of the new pipeline, including possible cost savings to Spire Missouri and whether the new pipeline was needed to allow Spire Missouri to cease using propane peaking facilities. And more generally, EDF argued that the Commission had failed to adequately balance costs and benefits in the Certificate Order.

On October 1, 2018, the Secretary of the Commission issued a tolling order solely "to afford additional time for consideration of the matters raised." J.A. 1107. It appears that during the period between the issuance of the Certificate Order and September 2019, Spire STL completed virtually all

18

construction of the pipeline. *See* J.A. 1135 (notice of Enable MRT withdrawing its petition for rehearing and asserting that "[i]n the year in which the [rehearing requests] ha[d] been pending, Spire STL . . . ha[d] nearly completed construction of the proposed pipeline"). During that period, Spire STL also submitted a revised cost estimate to the Commission of almost $287 million, or approximately $67 million more than it had originally estimated.

On November 21, 2019, the Commission issued an Order on Rehearing (the "Rehearing Order"), denying the requests for rehearing on the merits. The Commission reaffirmed its belief that it "is not required to look behind precedent agreements to evaluate project need, regardless of the affiliate status of the . . . shipper." J.A. 1149 (footnote omitted). It also asserted that it had "evaluated the record and did not find evidence of impropriety or self-dealing to indicate anti-competitive behavior or affiliate abuse." J.A. 1152 (footnote omitted). And it reiterated that, in its view, it was "not in the position to evaluate Spire Missouri's business decision to enter a contract with Spire STL for natural gas transportation." J.A. 1152 (footnote omitted).

The Commission also stated that several of the benefits Spire STL touted in its application and subsequent submissions to the Commission were "sufficient to overcome any concerns of overbuilding." J.A. 1155. As to cost, the Commission clarified that the Certificate Order had "evaluated cost differences of gas delivered to Spire Missouri from both the" proposed new pipeline and Enable MRT's existing system and found that they "were not materially significant." J.A. 1159 (citing J.A. 980). Finally, the Rehearing Order found that the EA, and the Commission's resulting environmental analysis, were sound.

19

Commissioner Glick again dissented. He argued that the Commission had acted arbitrarily and capriciously by refusing to engage with counterevidence or seriously consider countervailing arguments as to market need and benefits of the pipeline. *See, e.g.*, J.A. 1183 ("Whatever probative weight that [precedent] agreement has, the Commission cannot simply point to the agreement's existence and then ignore the evidence that undermines the agreement's probative value."); J.A. 1185 ("The Spire companies' obvious financial motive coupled with the abundant record evidence casting doubt on the need for the project ought to have caused the Commission to carefully scrutinize the record to determine whether the [proposed pipeline] is actually needed or just financially advantageous to the Spire companies."). In his view, the issuing of the Certificate to Spire STL had also represented "an unreasonable application of the . . . Certificate Policy Statement." J.A. 1188.

Steck and EDF filed their petitions for review in this court on January 21, 2020.

## II. ANALYSIS

### A.  Standard of Review

The Commission's award of a Certificate is reviewed under the Administrative Procedure Act's arbitrary and capricious standard. *See Minisink*, 762 F.3d at 105-06 (citations omitted); 5 U.S.C. § 706(2)(A). Under this standard, an action by the Commission may be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, the

20

overarching question in this case is whether "the Commission's 'decisionmaking [wa]s reasoned, principled, and based upon the record.'" *Myersville*, 783 F.3d at 1308 (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010)). "A passing reference to relevant factors . . . is not sufficient to satisfy the Commission's obligation to carry out 'reasoned' and 'principled' decisionmaking"; this means that "[t]he Commission must 'fully articulate the basis for its decision.'" *Am. Gas Ass'n*, 593 F.3d at 19 (quoting *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000)). When the Commission's explanation for a contested action is lacking or inadequate, it will not survive judicial review and the matter will be returned to FERC for appropriate action. *See, e.g.*, *Mo. Pub. Serv. Comm'n*, 234 F.3d at 42.

## B. Standing

The "irreducible constitutional minimum" of standing requires three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). The party invoking federal jurisdiction bears the burden of demonstrating standing. *Id.* (citation omitted). Generally, "[t]o establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Id.* at 1548 (citation and internal quotation marks omitted). However, where a party alleges procedural injury, "courts relax the normal standards of redressability and imminence." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009)).

21

In a NEPA procedural injury case, the causation requirement is met when a "causal chain" contains "at least two links: one connecting the omitted [NEPA analysis] to some substantive government decision that may have been wrongly decided because of the lack of [proper NEPA analysis] and one connecting that substantive decision to the plaintiff's particularized injury." *Id.* (alterations in original) (citation omitted). In other words, "[i]t must be substantially probable that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff." *Id.* (citation and internal quotation marks omitted).

### 1. Steck's Standing

Steck does not have standing to pursue her claims against FERC in this court. She does not own land transected by Spire STL's pipeline and has not had property rights taken via eminent domain. Instead, Steck asserts in a declaration that she lives "half a mile from" the new Chain of Rocks meter and regulation station (the "Chain of Rocks Station") at "the southern end of the pipeline," Final Br. of Pet'r Juli Steck Addendum 1 (hereinafter "Steck Decl.") ¶ 4; that the metering station "sits between . . . blind curves," *id.* ¶ 5; that the station "is a looming eyesore and a traffic hazard" which "is not in keeping with the character of [her] neighborhood," and which she passes approximately three times per week, *id.* ¶ 7; and that the now-completed construction of the pipeline "interfered with [her] use and enjoyment of" a local park through which part of the pipeline was built, *id.* ¶¶ 9-10, and that she "experienced the noise, dust, diesel fumes, and traffic stops from construction both at home and in" the park, *id.* ¶ 8.

22

Steck claims that the "blind curves" near the metering station are a "traffic hazard" to which she objects. Even if this is sufficient to show a cognizable injury-in-fact, Steck has not met her burden on causation as to this alleged injury. This is so because she does not claim that the blind curves resulted from the construction of the Chain of Rocks Station. Therefore, she has not shown that issuance of a Certificate to Spire STL caused any "traffic hazard" that now exists.

In addition, any alleged injuries that Steck suffered during the now-completed construction of the pipeline and metering station cannot support standing for want of redressability. Those alleged injuries, including that Spire's "drill[ing] under [a] lake" to construct the pipeline interfered with her "use and enjoyment of the [nearby] park," *id.* ¶ 9, ended when the construction was completed. Nor does Steck assert that there is any lasting impact from these prior injuries. Therefore, a favorable judicial decision will not redress her alleged injuries.

Steck also alleges that the metering station "is a looming eyesore," *id.* ¶ 7, as if to suggest that this constitutes a cognizable injury-in-fact. It is true that some intangible injuries may be concrete enough to support standing. *See Spokeo*, 136 S.Ct. at 1549. And "[t]he Supreme Court has recognized that harm to 'the mere esthetic interests of [a] plaintiff . . . will suffice' to establish a concrete and particularized injury" sufficient to support standing. *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (third alteration in original) (quoting *Summers*, 555 U.S. at 494). However, Steck's claims that allude to aesthetic injuries do not correspond with the types of aesthetic interests that the Supreme Court has said will suffice to establish concrete and particularized injuries.

At no point in her declaration does Steck indicate any ways in which the new metering station injures her specific aesthetic

23

interests, beyond labeling it a "looming eyesore" that "is not in keeping with the character of [her] neighborhood." *See* Steck Decl. ¶ 7. She never alleges that she used and enjoyed the land on which the station now exists; that she intended to use the land in the future; or that her planned future uses of the land have been foreclosed by the construction. In other words, she never indicates how she derived aesthetic value from the land as it had existed before the construction. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that environmental group lacked standing because "[n]owhere in the pleadings or affidavits did the [group] state that its members *use* [the affected area] for any purpose, much less that they *use* it in any way that would be significantly affected by the proposed actions of the respondents" (emphases added)); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565-66 (1992) (explaining that "a plaintiff claiming injury from environmental damage *must use the area affected* by the challenged activity" (emphasis added)); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181-83 (2000) (explaining that organizations' members would have had standing as a result of the detailed ways in which the challenged actions had led them to modify their prospective behavior, reduced their property values, or otherwise diminished their enjoyment of the affected areas); *Jewell*, 764 F.3d at 5-6 (recounting detailed declarations explaining the ways in which the challenged action would diminish declarants' ability to "use, enjoy, and appreciate," or "ability to visit and enjoy," affected areas (citations omitted)).

Steck does not even allege that she can see the new station from her property. Rather, the only aesthetic injury that might be implied from her declaration is that she must look at an "eyesore" several times per week while driving past. Viewed in full frame, Steck's alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support

24

standing. *See Lujan*, 504 U.S. at 573-74 (explaining that generalized grievances do not raise Article III cases or controversies for standing purposes).

At oral argument, Steck's counsel was unable to identify any authority that would allow mere incidental viewership of something unappealing to qualify as an injury-in-fact for standing purposes. *See* Oral Arg. Tr. at 27:21-28:23. This is not surprising, for we can find nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing. In her brief, Steck cites *Sierra Club v. FERC* for the proposition that "[a]esthetic and recreational harm [may] bestow[] standing." Final Br. of Pet'r Juli Steck 10 (citing 827 F.3d 59, 66 (D.C. Cir. 2016)). However, the declaration in support of standing in *Sierra Club* is strikingly different from Steck's declaration in this case. The declarant in *Sierra Club* "fishe[d], boat[ed], and seasonal duck hunt[ed] frequently around" the affected areas. 827 F.3d at 66 (citation and alterations omitted). The declarant further averred that the resulting "'increase in liquefied natural gas vessel traffic' . . . w[ould]: (1) harm his aesthetic interests in the [nearby] waterways . . . ; (2) inconvenience him, given the 'large exclusion zone the Coast Guard maintains around tankers'; and (3) 'diminish his use and enjoyment of the waterways.'" *Id.* (citation and alterations omitted). He also noted that, because of the "existing levels of operation" in the affected areas, he had "moved his 'primary boat'" away from them. *Id.* (citation omitted). These concrete injuries, including those to his aesthetic interests, are a far cry from those asserted by Steck, who has neither altered her behavior nor explained why she has any particularized connection to the land on which the metering station now sits.

25

Finally, Steck claims that she has suffered a procedural injury as a result of the Commission's alleged failure to comply with its NEPA obligations. *See* Final Br. of Pet'r Juli Steck 10; Steck Decl. ¶ 10; *see also* Oral Arg. Tr. at 27:18-20, 33:19-25. Steck argues that this procedural injury is "an independent source of standing." Oral Arg. Tr. at 33:24-25. "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *see also Spokeo*, 136 S. Ct. at 1550 (explaining that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation"). Because Steck has failed to allege a concrete injury that is "tethered to" the Commission's issuance of the Certificate, she has not shown a viable Article III injury. *Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).

In sum, on the record before us, we hold that Steck has failed to satisfy her burden of demonstrating standing. We therefore dismiss her petition for review.

## 2. EDF's Standing

EDF clearly has standing to pursue its claims. "An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507-08 (D.C. Cir. 2020) (citation and internal quotation marks omitted). EDF's members include at least four individuals who own land transected by Spire STL's pipeline, each of whom have had

26

property rights taken via eminent domain. These EDF members also allege various ways in which the presence of the pipeline has harmed, and continues to harm, their property, economic, aesthetic, and emotional interests.

"[A] landowner made subject to eminent domain by a decision of the Commission has been injured in fact because the landowner will be forced either to sell its property to the pipeline company or to suffer the property to be taken through eminent domain. . . . [I]t is enough that [eminent domain proceedings] have been deemed authorized and will proceed absent a sale by the owner." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 271-72 (D.C. Cir. 2015) (citing *B&J Oil & Gas v. FERC*, 353 F.3d 71, 74-75 (D.C. Cir. 2004)). Moreover, "credible claims of exposure to increased noise and . . . disruption of daily activities . . . are sufficient to satisfy Article III's injury-in-fact requirement." *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) (quoting *Sierra Club*, 827 F.3d at 44). Those injuries were caused by the Commission's orders, which allowed for the exercise of eminent domain against the EDF members' land, and vacatur of those orders likely will allow those injuries to be redressed. *See City of Oberlin*, 937 F.3d at 604-05. "And nobody disputes that the prevention of this sort of injury is germane to [EDF]'s conservation-oriented purposes, or cites any reason why these individual members would need to join the petition in their own names." *Sierra Club*, 867 F.3d at 1366. Thus, EDF has associational standing.

## C. EDF's Petition Was Timely

The Natural Gas Act requires that, prior to obtaining judicial review, an aggrieved party must have sought rehearing before the Commission "unless there [wa]s reasonable ground for failure so to do." 15 U.S.C. § 717r(b). The Act also states

27

that "[u]nless the Commission acts upon the application for rehearing within thirty days after it is filed, such application *may be deemed to have been denied*." *Id.* § 717r(a) (emphasis added). As to the timing of judicial review, the act provides that an aggrieved party "may obtain a review" of a Commission order "by filing" a petition for review "within sixty days after the order of the Commission upon the application for rehearing." *Id.* § 717r(b).

In *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), we confronted the Commission's then-consistent practice of issuing "tolling orders" following rehearing requests. *See id.* at 9-11. The tolling orders were fashioned so that they "d[id] nothing more than prevent [rehearing requests] from being deemed denied by agency inaction and preclude . . . applicant[s] from seeking judicial review until the Commission act[ed]" on the merits. *Id.* at 9. This court found that such tolling orders were insufficient for FERC to avoid a "deemed denial" per 15 U.S.C. § 717r(a). *Id.* at 18-19.

In this case, EDF filed a request for rehearing with the Commission on September 4, 2018. On October 1, 2018, the Secretary issued a tolling order that did nothing more than "afford additional time for consideration of the matters raised" in rehearing requests. J.A. 1107; *see Allegheny Def. Project*, 964 F.3d at 6-7 (same language in tolling order at issue). The Commission did not dispose of the merits of the rehearing requests in this case until November 21, 2019, when it issued the Rehearing Order. *See* J.A. 1144. EDF then filed its petition for review in this court on January 21, 2020. According to the Spire Intervenor-Respondents (but not the Commission), EDF's petition for review was untimely because, under *Allegheny Defense Project*, the requests for rehearing were "deemed denied" as of October 4, 2018. And, since the petition

28

for review was submitted more than 60 days thereafter, the court lacks jurisdiction. *See* Br. for Intervenors-Resp't's Spire STL Pipeline LLC and Spire Missouri Inc. 1-2. We reject this argument.

In *Texas-Ohio Gas Co. v. Federal Power Commission*, 207 F.2d 615 (D.C. Cir. 1953), we held that the 60-day requirement of Section 717r(b) did not preclude our consideration of a petition for review from a final denial of relief, even if there had been a deemed denial in the interim and the petition for review was filed more than 60 days following that deemed denial. *See id.* at 616-17. *Allegheny Defense Project* did not disturb this binding precedent, which is squarely controlling in this case.

Moreover, in *Allegheny Defense Project*, the petitioners filed two sets of petitions for review. *See* 964 F.3d at 6-9. The first set was filed in March and May 2017, within 60 days of the March 2017 tolling order, *see id.* at 6-7, while the second was filed in December 2017 and January 2018, after the Commission rejected the merits of the rehearing requests, *see id.* at 8-9. Though this court found that the tolling order failed to prevent a deemed denial as of March 2017, the court proceeded to evaluate the merits of *both* sets of petitions for review, including the later set of petitions filed more than 60 days following the date of "deemed denial." *See id.* at 19.

EDF filed its petition for review on January 21, 2020, within the period allowed by statute "after the order of the Commission upon the application for rehearing." 15 U.S.C. § 717r(b). The petition for review was therefore timely and we may consider the merits of EDF's contentions.

29

## D. FERC's Grant of a Certificate of Public Convenience and Necessity Was Arbitrary and Capricious

Under established law, precedent agreements are "always . . . important evidence of demand for a project." *Minisink*, 762 F.3d at 111 n.10 (quoting 88 FERC at 61,748). And, in some cases, such agreements may demonstrate both market need and benefits that outweigh adverse effects of a new pipeline. *See City of Oberlin*, 937 F.3d at 605-06; *Myersville*, 783 F.3d at 1311. But there is a difference between saying that precedent agreements are always *important* versus saying that they are always *sufficient* to show that construction of a proposed new pipeline "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

According to the Commission's Certificate Policy Statement, "the evidence necessary to establish the need for [a] project will usually include a market study. . . . Vague assertions of public benefits will not be sufficient." 88 FERC at 61,748. In addition, the Certificate Policy Statement indicates that pipelines built for reasons other than demand growth might require greater showings of need and public benefits. *See id.* ("[P]rojects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline."). The Policy Statement also explicitly states that "[a] project that has precedent agreements with multiple new customers may present a greater indication of need than a project with only a precedent agreement with an affiliate." *Id.* In addressing why it is unnecessary for the Commission to categorically discount the value of affiliated precedent agreements when assessing applications to construct new pipelines, the Policy Statement explains that, in all cases, the Commission invariably focuses

30

on "the impact of the project on the relevant interests balanced against the benefits to be gained from the project." *Id.* Finally, it is noteworthy that nothing in the Certificate Policy Statement suggests that a precedent agreement is conclusive proof of need in a situation in which there is no new load demand, no Commission finding that a new pipeline would reduce costs, only a single precedent agreement in which the pipeline and shipper are corporate affiliates, the affiliate precedent agreement was entered into privately after no shipper subscribed during an open season, and the agreement is not for the full capacity of the pipeline.

In this case, the Commission was presented with strong arguments as to why the precedent agreement between Spire STL and Spire Missouri was insufficiently probative of market need and benefits of the proposed pipeline. Indeed, those arguments drew on the Commission's own Certificate Policy Statement for support. But rather than engaging with these arguments, the Commission seemed to count the single precedent agreement between corporate affiliates as conclusive proof of need. Nothing in the Certificate Policy Statement endorses this approach.

Furthermore, we can find no judicial authority endorsing a Commission Certificate in a situation in which the proposed pipeline was not meant to serve any new load demand, there was no Commission finding that a new pipeline would reduce costs, the application was supported by only a single precedent agreement, and the one shipper who was party to the precedent agreement was a corporate affiliate of the applicant who was proposing to build the new pipeline. This is hardly surprising because evidence of "market need" is too easy to manipulate when there is a corporate affiliation between the proponent of a new pipeline and a single shipper who have entered into a precedent agreement. *See Chinook Power Transmission, LLC,*

31

126 FERC ¶ 61,134, 61,767 (2009) (explaining that, in a different context, the Commission "will apply a higher level of scrutiny" to certain affiliate transactions "due to the absence of arms' length negotiations as a basis for the commitment, concerns that the affiliate would receive unduly preferential treatment, further concerns that a utility affiliate contract could shift costs to captive ratepayers of the affiliate and subsidize the . . . project inappropriately, and the lack of transparency that would surround the arrangement").

Moreover, in this case the Commission failed to adequately balance public benefits and adverse impacts. This is a serious problem in a case in which there is no new load demand and only one affiliated shipper. In the Certificate Order, the Commission's balancing of costs and benefits consisted largely of its *ipse dixit* "that the benefits that the [proposed pipeline] will provide to the market, including enhanced access to diverse supply sources and the fostering of competitive alternatives, outweigh the potential adverse effects on existing shippers, other pipelines and their captive customers, and landowners or surrounding communities." J.A. 986. The Commission pointed to no concrete evidence to support these assertions.

In the Rehearing Order, the Commission made a superficial effort to remedy the obvious deficits of the Certificate Order by noting that Spire Missouri had articulated several public benefits for the proposed pipeline. *See* J.A. 1155-56. However, the Commission never addressed the claims raised by EDF and others challenging whether these purported benefits were likely to occur. Instead of evaluating the legitimate claims that had been raised, the Commission simply stated that it had "no reason to second guess the business decision of" Spire Missouri as reflected in the precedent agreement. Rehearing Order, J.A. 1155; *see also*

32

Rehearing Order, J.A. 1159 (declining to evaluate extent to which Spire Missouri's customers would experience economic benefit from pipeline construction because doing so would "second guess the business decisions of an end user"). Before this court, EDF has continued to challenge the Commission's failure to appropriately scrutinize the costs and alleged benefits of the project. *See* Final Opening Br. of Pet'r EDF 39-40; *see also* Final Reply Br. of Pet'r EDF 15-18 (asserting that purported benefits of proposed pipeline were invoked post hoc by the Commission, unlikely to be realized, or pretextual). Under the circumstances presented in this case – with flat demand as conceded by all parties, no Commission finding that a new pipeline would reduce costs, and a single precedent agreement between affiliates – we agree with EDF that the Commission's approach did not reflect reasoned and principled decisionmaking.

The Commission and the Spire Intervenor-Respondents advance several arguments in response, but none carry the day. First, they rely on isolated statements this court has made while reviewing previous Commission grants of Certificates. In *Minisink*, we echoed the Certificate Policy Statement in explaining that precedent "agreements 'always will be important evidence of demand for a project.'" 762 F.3d at 111 n.10 (quoting 88 FERC at 61,748). Similarly, in *Myersville*, we noted that the petitioners had "'identif[ied] nothing in the policy statement or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers.'" 783 F.3d at 1311 (quoting *Minisink*, 762 F.3d at 111 n.10). In *City of Oberlin*, we upheld the Commission's decision to treat both affiliated and unaffiliated precedent agreements as evidence of market need, as "it is Commission policy to not look behind precedent or service agreements to make

33

judgments about the needs of individual shippers." 937 F.3d at 606 (quoting *Myersville*, 783 F.3d at 1311). And in *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, (D.C. Cir. Feb. 19, 2019) (per curiam) (unpublished), the court upheld the Commission's decision not to distinguish between affiliated and unaffiliated precedent agreements under the facts of that case. *See id.* at *1. According to the Commission and the Spire Intervenor-Respondents, these cases stand for two broad propositions: (1) that the Commission generally need not look behind precedent agreements in determining whether there is market demand; and (2) that affiliated precedent agreements should almost always be treated the same as unaffiliated precedent agreements. We disagree, because it is quite clear that our case law does not go so far as Respondents claim.

In both *Minisink* and *Myersville*, the precedent agreements at issue were not alleged to be between affiliated entities. *See Minisink*, 762 F.3d at 111 n.10; *Myersville*, 783 F.3d at 1307, 1309-10. Thus, those cases presented significantly different facts than the instant Certificate application. *Appalachian Voices* was an unpublished opinion, meaning that the panel found its opinion to be of "no precedential value" when disposing of the case. *See* D.C. CIR. R. 36(e)(2). Moreover, unlike in this case, the Certificate applicant in that case had submitted a market study to the Commission to show the need for, and benefits of, the proposed project. *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, 61,297 (2017).

In *City of Oberlin*, the pipeline applicant had entered into four precedent agreements with affiliate shippers but had entered eight precedent agreements in total. *See* 937 F.3d at 603. The facts of that case are therefore easily distinguishable, and the evidence of market demand was much stronger than in the instant case, where there is but a single precedent

34

agreement and it is with an affiliated shipper. It is true that *City of Oberlin* says that FERC can put precedent agreements with affiliates on the same footing as non-affiliate precedent agreements (*i.e.*, it may "fully credit[]" them), but only so long as FERC finds "no evidence of self-dealing" or affiliate abuse and the pipeline operator "bears the risk for any unsubscribed capacity." *Id.* at 605. And tellingly, the Commission made an uncontested finding that there was "no evidence of self-dealing" or affiliate abuse in *City of Oberlin*. *See id.*

Here, by contrast, EDF and others have identified plausible evidence of self-dealing. This evidence includes that the proposed pipeline is not being built to serve increasing load demand and that there is no indication the new pipeline will lead to cost savings. FERC's failure to engage with this evidence did not satisfy the requirements of reasoned decisionmaking. Indeed, as noted above, FERC's ostrich-like approach flies in the face of the guidelines set forth in the Certificate Policy Statement. The challenges raised by EDF and others were more than enough to require the Commission to "look behind" the precedent agreement in determining whether there was market need. If it was not necessary for the Commission to do so under these circumstances, it is hard to imagine a set of facts for which it would ever be required. Because the Commission declined to engage with EDF's arguments and the underlying evidence regarding self-dealing, its decisionmaking was arbitrary and capricious.

Next, the Commission contends that its balancing of benefits and adverse impacts was sufficient because the Natural Gas Act "vests the Commission with 'broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.'" Br. for Resp't FERC 42 (quoting *Minisink*, 762 F.3d at 111). The Commission's discretion in this sphere is, indeed, broad, but it may not go

35

entirely unchecked. The Commission must provide a cogent explanation for how it reached its conclusions. As discussed, FERC failed to balance the benefits and costs in both the Certificate Order and Rehearing Order.

Finally, Respondents claim that there is evidence in the record supporting their assertions as to the benefits of the pipeline, even in the absence of increasing demand or potential cost savings. However, it is not enough that such evidence may exist within the record; the question is whether the Commission's decisionmaking, as reflected in its orders, will allow us to conclude that the Commission has sufficiently evaluated that evidence in reaching a reasoned and principled decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 93-95 (1943); *SEC v. Chenery Corp*, 332 U.S. 194, 196 (1947). Based on the Certificate Order and Rehearing Order, we cannot say that the Commission has done so. It is not surprising that the Commission failed to seriously engage with the question of whether these benefits were real or illusory given that it took the position that it would "not second guess the business decisions" of the pipeline shipper in this case. Certificate Order, J.A. 968.

In sum, it was arbitrary and capricious for the Commission to rely solely on a precedent agreement to establish market need for a proposed pipeline when (1) there was a single precedent agreement for the pipeline; (2) that precedent agreement was with an affiliated shipper; (3) all parties agreed that projected demand for natural gas in the area to be served by the new pipeline was flat for the foreseeable future; and (4) the Commission neglected to make a finding as to whether the construction of the proposed pipeline would result in cost savings or otherwise represented a more economical alternative to existing pipelines. In addition, the Commission's cursory

36

balancing of public benefits and adverse impacts was arbitrary and capricious.

## III. Remedy

The final question that we must address concerns remedy. The Spire Intervenor-Respondents urge that, if we set aside FERC's certification, we should remand without vacatur. EDF, in turn, contends that vacatur is appropriate. "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation and internal quotation marks omitted). However, "[v]acatur 'is the normal remedy' when we are faced with unsustainable agency action." *Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

Based on these considerations, we believe that vacatur is appropriate. Given the identified deficiencies in the Commission's orders, it is far from certain that FERC "chose correctly," *see Allied-Signal*, 988 F.2d at 150 (citation omitted), in issuing a Certificate to Spire STL. We understand that the pipeline is operational, and thus there may be some disruption as a result of the "interim change," *see id.* at 150-51 (citation omitted), *i.e.*, de-issuance of the Certificate, caused by vacatur. However, we have identified serious deficiencies in the Certificate Order and Rehearing Order. And "the second *Allied–Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale." *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (citation omitted).

37

The Commission's ability to do so is not at all clear to us at this juncture.

Furthermore, remanding without vacatur under these circumstances would give the Commission incentive to allow "build[ing] first and conduct[ing] comprehensive reviews later." *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021). We certainly do not wish to encourage such an approach given the significant powers that accompany a certificate of public convenience and necessity. *See* 15 U.S.C. § 717f(h) (allowing holder of Certificate to exercise eminent domain); *see also* Rehearing Order, J.A. 1195-96 (Glick, Comm'r, dissenting) (noting that "Spire STL prosecuted eminent domain actions against over 100 distinct entities . . . involving well over 200 acres of privately owned land"). *See generally* Rehearing Order, J.A. 1202 (Glick, Comm'r, dissenting) ("A regulatory construct that allows a pipeline developer to build its entire project while simultaneously preventing opponents of that pipeline from having their day in court ensures that irreparable harm will occur before any party has access to judicial relief.").

## IV. CONCLUSION

For the foregoing reasons, we dismiss Juli Steck's petition for review and grant EDF's petition for review. We vacate the Certificate Order and Rehearing Order and remand to the Commission for further proceedings.